**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-2193**

---

VICTOR M. CERRITOS RIVAS,

       Petitioner,

    v.

PAMELA JO BONDI, Attorney General,

       Respondent.

---

On Petition for Review of an Order of the Board of Immigration Appeals.

---

Submitted: August 14, 2025                    Decided: January 9, 2026

---

Before WILKINSON and BENJAMIN, Circuit Judges, and TRAXLER, Senior Circuit Judge.

---

Petition for review denied by unpublished per curiam opinion.

---

**ON BRIEF:** Jorge E. Artieda, JORGE E. ARTIEDA LAW OFFICE P.C., Falls Church, Virginia, for Petitioner. Yaakov M. Roth, Acting Assistant Attorney General, Lindsay B. Glauner, Assistant Director, Kitty M. Lees, Office of Immigration, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Victor Manuel Cerritos Rivas petitions for review of the order of the Board of Immigration Appeals upholding the immigration judge's denial of his application seeking asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Finding no reversible error, we deny the petition for review.

I.

Cerritos Rivas was born in Sensuetepeque, El Salvador, in 1980; his mother is Maria De Derivas. When Cerritos Rivas was just two months old, his father was murdered by Raul Morales, who wanted the family's land and cattle. Morales told De Derivas that if she did not leave the area, he would make her and her children "disappear." J.A. 94. De Derivas believed the threats; she buried her husband and immediately left with her children (Cerritos Rivas and two daughters), her sister, and her mother for San Juan Opico, another city in El Salvador about six hours away. Her father and her husband's stepfather did not leave, and they were both murdered by Morales a few months later. Morales took over the property once the family was gone.

In San Juan Opico, De Derivas remained fearful of Morales and largely kept her children in hiding. Cerritos Rivas attended school for some period of time, but De Derivas removed him from school in the first grade after being told that Morales "found out where we were living." J.A. 97. Despite her fear of Morales, De Derivas worked outside the home, at a farm collecting eggs, and her mother and sister regularly left the house during the day.

De Derivas remained in San Juan Opico with her family for 10 years; during that time, she "heard that [Morales] was looking for us," J.A. 107, but neither she nor anyone

2

else ever saw Morales or his associates. In 1991, De Derivas left her children with her mother and moved to the United States. Cerritos Rivas joined her in the United States in 1999, when he was 18 years old. At some point thereafter, Cerritos Rivas's sisters moved to a different location in El Salvador because Morales found out where they had been living. Eventually, his sisters also moved to the United States.

At the hearing before the immigration judge, Cerritos Rivas testified that he was afraid to return to El Salvador because family friends have told De Derivas that Morales and his associates are "still around" and could find his family. J.A. 78. De Derivas testified that Morales killed her husband and other family members "[b]ecause that's what he does. He wanted to own everything." J.A. 95. She testified that her friend "told me over the phone that he's still looking for us, and . . . he's waiting for us to return. And when we do, that he will get us because they're afraid that we would go and press charges for what he's done and for the fact that he has taken over our property." J.A. 99.

## II.

## A.

Under the Immigration and Nationality Act, the Attorney General may confer asylum on a "refugee," which is defined as a person unwilling or unable to return to her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "The asylum-seeker bears the burden of demonstrating [his] refugee status," and must demonstrate a well-founded fear of persecution on account of a protected ground because of a threat by the government or by an organization the

3

government is unable or unwilling to control. *Velasquez v. Sessions*, 866 F.3d 188, 193-94 (4th Cir. 2017). "Persecution occurs 'on account of' a protected ground if that ground serves as at least one central reason for the feared persecution." *Toledo-Vasquez v. Garland*, 27 F.4th 281, 286 (4th Cir. 2022) (cleaned up). "A central reason is not necessarily the central reason or even a dominant central reason, but it must be more than incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* (cleaned up). The requirement that the persecution be "on account of" the petitioner's membership in a protected social group is generally referred to as the "nexus" requirement.

"[W]ithholding of removal covers a narrower . . . set of circumstances than asylum," and requires the applicant to "demonstrate a clear probability of persecution." *Yi Ni v. Holder*, 613 F.3d 415, 427 (4th Cir. 2010) (cleaned up). Because of the higher evidentiary threshold, "an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal." *Id.* (cleaned up).

To prevail on a claim under the CAT, an applicant must first establish that "it is more likely than not that if removed he will suffer future mistreatment—that is, he will endure severe pain or suffering that is intentionally inflicted." *McDougall v. Bondi*, ___ F.4th ___, 2025 WL 2552334, at *4 (4th Cir. Sept. 5, 2025) (cleaned up). If the claimant establishes a likelihood of future torture, he must also show "that this likely future mistreatment will occur at the hands of government officials or with the consent or acquiescence of government officials." *Id.* (cleaned up).

4

B.

The immigration judge ("IJ") denied Cerritos Rivas' applications for asylum, withholding of removal, and CAT protection. As to the claims for asylum and withholding of removal, the IJ assumed that the particular social groups proposed by Cerritos Rivas— family members of Cerritos Rivas' father, and male landowners in El Salvador—were cognizable. The IJ nonetheless held that Cerritos Rivas failed to show that any persecution would be on account of Cerritos Rivas' membership in those social groups. The IJ explained:

> There is no evidence that Morales or his people had anything other than a criminal motive in the tragic murders of the respondent's father and grandfathers some four decades ago. As the respondent and his mother both testified, it appears that the one and only central reason for the murders was Morales's desire to take the land and cattle owned by the respondent's family. Nothing Morales said or did shows an animosity against or an intent to harm the respondent because he was related to his father or because he was a male land owner. Morales wanted the property and, according to the respondent, he took the property after the family fled to another town.

J.A. 42-43.

The IJ also concluded that even if the evidence were enough to establish the required nexus, the presumption of future persecution, *see* 8 C.F.R. § 1208.13, was rebutted because Cerritos Rivas "lived without receiving any harm or threats in another town for 18 years," and "[t]here is no reason he could not return to that town, or perhaps some other place in El Salvador, and avoid further persecution." J.A. 43.

As to the CAT claim, the IJ held that Cerritos Rivas was not tortured in the past and that the likelihood "of future torture from Morales or his people are less than even 10 percent; certainly much less than the requisite greater than 50 percent chance required for

5

this form of relief." J.A. 43 (cleaned up). The IJ also concluded that Cerritos Rivas failed to "demonstrate[] that public officials in El Salvador would acquiesce or turn a blind eye to any negligible chance of torture he does face." *Id.*

The Board found no error in the IJ's decision and dismissed the appeal. The Board affirmed the IJ's determination that Cerritos Rivas had not established that "a protected ground is a 'central reason' for the claimed persecution or feared future persecution" because none of Morales's actions or threats "shows an animosity against, or an intent to harm the respondent, because he was related to his father or because he was a male land owner." J.A. 4. Because the evidence showed that Morales wanted the property and took it once the family fled, the Board concluded that the IJ "permissibly found that the nexus requirement was not met, given the respondent and his mother both testified that it was Morales's desire to take the land and cattle owned by his family." J.A. 4.

Because the lack of nexus rendered Cerritos Rivas ineligible for asylum or withholding of relief, the Board declined to consider Cerritos Rivas' arguments that the proposed social groups were cognizable, that the presumption of future persecution was rebutted, and that the IJ erred by relying on agency caselaw that had been withdrawn. The Board also upheld the IJ's denial of the CAT claim, noting that Cerritos Rivas "has not meaningfully challenged the finding of likelihood of future torture, nor otherwise established clear error in such predictive finding." J.A. 4-5.

III.

Cerritos Rivas petitions for review of the Board's order, challenging the denial of his applications for asylum, withholding of removal, and protection under the CAT. "Upon

6

a petition for review of a final BIA order, this Court reviews all factual findings for substantial evidence, and all legal conclusions de novo." *Moreno-Osorio v. Garland*, 2 F.4th 245, 251–52 (4th Cir. 2021). "Congress has statutorily prescribed for us a particularly stringent standard of review for factual findings, mandating that they be deemed 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). Whether the nexus requirement has been satisfied and whether there is a likelihood of future torture are factual questions to be resolved by the Board and reviewed by this court under the substantial-evidence standard. *See Madrid-Montoya v. Garland*, 52 F.4th 175, 179 (4th Cir. 2022); *Ibarra Chevez v. Garland*, 41 F.4th 279, 293 (4th Cir. 2022). The Board did not adopt the IJs opinion, and our review therefore focuses on the Board's decision.

A.

As to the asylum and withholding of removal claims, the bulk of Cerritos Rivas' brief focuses on the cognizability of his proposed social groups, an issue that is not relevant because both the IJ and the Board assumed that the proposed social groups were cognizable. He does, however, assert—albeit with little elaboration—that the Board erred by finding no nexus between his membership in his proposed social groups and Morales' actions. We disagree.

Because nexus is a factual question, "our task is not to decide how we would rule in the first instance. Rather, we must uphold the Board's finding unless no rational factfinder could reach the same conclusion." *Toledo-Vasquez*, 27 F.4th at 286. "Thus, where the record plausibly could support two results: the one the IJ chose and the one the petitioner

7

advances, reversal is only appropriate where the court finds that the evidence not only supports the opposite conclusion, but compels it." *Moreno-Osorio*, 2 F.4th at 256–57 (cleaned up).

"[I]n cases involving family-based particular social groups, . . . the operative question is whether the petitioner's membership in their family is a central reason why they, and not some other person were targeted." *Perez Vasquez v. Garland*, 4 F.4th 213, 222 (4th Cir. 2021) (cleaned up). As this court has explained, "even a threat that specifically references a family member is not necessarily made 'on account of' the familial relationship." *Cedillos-Cedillos v. Barr*, 962 F.3d 817, 825 (4th Cir. 2020). For example, we have held that where a gang-involved murder was witnessed by a family member of the victim, death threats made by the gang against the witness are not necessarily made because of the familial relationship, as "[t]hat same threat could have been directed at any person who knew about the gang members' criminal activities." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 950 n.7 (4th Cir. 2015); *accord Cedillos-Cedillos,* 962 F.3d at 825. Likewise, we have held that threats made against the wife of a person who was murdered by a gang in order to take over his property are not necessarily made on account of the familial relationship because they could be made against anyone who might have an ownership claim on the property. *See Madrid-Montoya*, 52 F.4th at 185.

Applying these cases, we believe the Board's determination that Morales' actions were motivated by his criminal interest in obtaining the family's land and cattle is a plausible reading of the sparse information contained in the record. While the record could

8

perhaps have supported the contrary conclusion, the Board is the factfinder, and we must defer to its view of the facts so long as it is supported by substantial evidence.

As noted, Cerritos Rivas' mother testified that Morales killed her husband and stole the family's property "[b]ecause that's what he does. He wanted to own everything," J.A. 95, which indicates that Morales had done the same thing to other families and threatened anyone who stood in his way. Thus, as in *Madrid-Montoya*, the evidence in this case shows that the criminal actor "persecuted family members and nonfamily members alike." 52 F.4th at 184 (cleaned up). On this record, the Board could reasonably conclude that Morales would make the same threats to anyone with an ownership claim to property he coveted or anyone with knowledge of his criminal activities, which in turn provides support for the Board's determination that Morales' actions were based on his desire to keep the property he stole, not animus towards Cerritos Rivas' family or male landowners.

Moreover, Morales never directly threatened Cerritos Rivas. *See* J.A. 98 (De Derivas acknowledging that Cerritos Rivas was never directly threatened: "Right, . . . he was not a threatened person. And that way this man [Morales] failed."). He threatened De Derivas when he killed her husband, and he also threatened to kill her children if she did not leave the area. Nonetheless, while De Derivas testified that Morales learned the family was in San Juan Opico, neither Morales nor any of his associates were ever seen there, and they never again communicated a threat to De Derivas or to any of her children. The fact that the threats stopped once the family acquiesced to Morales' demands and fled their hometown provides further support for the Board's determination that Morales was motivated by criminal greed, not animus against Cerritos Rivas' family or male

9

landowners. *See Madrid-Montoya*, 52 F.4th at 185 ("The lack of continuing threats under these circumstances provides additional substantial evidence to support the BIA's interpretation of the narcotraffickers' motivations.").

Accordingly, the Board's no-nexus finding is supported by substantial evidence, and Cerritos Rivas' applications for asylum and withholding of removal were properly rejected.[*]

B.

With regard to the CAT claim, the IJ held that Cerritos Rivas failed to show a greater-than 50% likelihood that he would suffer torture at the hands of Morales if he returned to El Salvador. The Board noted that while Cerritos Rivas asserted on appeal that he was entitled to protection under the CAT, "he has not meaningfully challenged the finding of likelihood of future torture, nor otherwise established clear error in such predictive finding, and so cannot establish eligibility for CAT protection." J.A. 4-5. In his brief before this court, Cerritos Rivas' argument focuses on the second element of a CAT claim—whether the Salvadoran government would acquiesce to any future torture by Morales; he does not challenge the Board's analysis or the IJ's determination that he had not shown a likelihood of future torture. Because Cerritos Rivas does not challenge the

---

[*]      In his brief, Cerritos Rivas reasserts the arguments he made to the Board that his proposed social groups were cognizable, that the presumption of future persecution was rebutted, and that the IJ erred by relying on agency caselaw that had been withdrawn. Because the no-nexus finding was dispositive of the asylum and withholding of removal claims, the Board specifically declined to consider those arguments. We do likewise, as the issues raised by Cerritos Rivas are unrelated to and have no bearing on the Board's dispositive no-nexus finding.

Board's dispositive analysis, his challenge to the rejection of his claim seeking protection under the CAT fails.

## IV.

Accordingly, for the foregoing reasons, we reject Cerritos Rivas' challenges to the Board's order and deny his petition for review.

*PETITION FOR REVIEW DENIED*

11